**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **JOAQUIN M. SEQUEIRA** | : |
| **930 WAYNE AVE. APT. 502** | : |
| **SILVER SPRING, MD  20910** | : |
| | : |
| *On His Behalf and on* | : |
| *Behalf of a Class of* | : |
| *Persons Similarly* | : |
| *Situated* | : |
| | : |
| Plaintiffs | : |
| | : |
| v. | : |
| | : |
| **CITIMORTGAGE, INC.** | : |
| Serve on: | : |
| The Corporation Trust | : |
| Incorporated, Resident Agent | : |
| 351 West Camden Street | : |
| 6th Floor | : |
| Baltimore, MD 21201 | : |
| | : |
| Defendant | : |

Case No.   **11-2667**

**DEMAND FOR JURY TRIAL**

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Joaquin M. Sequeira ("Mr. Sequeira" or "Named Plaintiff"), through his

undersigned counsel files this Class Action Complaint and Request for Jury Demand and says in

support:

**I.  INTRODUCTION**

1.  The underlying matter involves just one thousands of other similar situations across the

State where homeowners are (i) seeking to change and modify their current mortgage

loans without requesting any additional advances, (ii) complying with all requests of their

servicer/lender in making the requests, but (iii) all their reasonable steps are ignored and

the homeowners are left with no other option but to seek the assistance of the courts.

2. These claims concern the utter failure of the Defendant CitiMortgage Inc. ("CitiMortgage" or "Defendant") to comply with Federal and Maryland law related to Mr. Sequeira's reasonable and appropriate requests to modify the terms of his mortgage loan subject to this action.

3. Many, but not all, Maryland homeowners facing foreclosure have reasonable and sustainable solutions to their mortgage situation.  Mr. Sequeira does have a sustainable solution, yet the Defendant, by and through their authorized agents, are threatening a wrongful foreclosure on Mr. Sequeira, as treating the  Class (defined in ¶ 46 below) similarly.

4. Further, if the Defendants and their authorized agents proceed to foreclosure sale of Mr. Sequeira's, as well as foreclosures against the Class members', home and property without having complied with Federal and Maryland law, Mr. Sequeira and the Class will sustain significantly greater damages and losses as a result through further loss of equity in their homes and emotional damages as a result of these proceedings and the Defendant's illegal actions (directly and indirectly through its authorized agents and affiliates).

## II.  The Parties

5. Plaintiff Joaquin M. Sequeira is an individual resident of Montgomery County and resides at 930 Wayne Ave., Apt. 502, Silver Spring, MD  20910 ("the Property").

6. Defendant CitiMortgage Inc. is registered to do business in the State of Maryland.  The resident agent for CitiMortgage is The Corporation Trust Incorporated located at 300 East Lombard Street, Suite 1400, Baltimore, MD 21202.  CitiMortgage is a Delaware corporation.

### III.  Jurisdiction

7.  This Court has jurisdiction and venue of the matters asserted herein.  Jurisdiction is appropriate for the following reasons:

    a.  On the basis of diversity of citizenship and in light of the amount in controversy is in excess of $75,000 exclusive of costs. 28 U.S.C. § 1332;

    b.  The matters asserted herein present federal questions.  28 U.S.C. § 1331; and

    c.  Pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(d), 1453, and 1711-1715 since the amount in controversy exceeds $5,000,000 and the members of the Plaintiff's class are citizens of a state different from the Defendant.

8.  Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201 and 2202, Md. Code Ann., §§ 3-401 – 3-415, and Fed. R. Civ. P. 23.

9.  Venue in this District is proper in that the Defendant transacts business within the District and the conduct complained of occurred in the District.

### IV.  Facts

**A.      The Foreclosure Crisis**

10. Over the last four years, Maryland and, indeed, the United States have been in a foreclosure crisis.  Recent news reports have established that one in ten American homes is at risk of foreclosure.

11. The number of Maryland properties with foreclosure filings has increased substantially throughout the last four years.

12. Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the homes surrounding a foreclosure and, perhaps, neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

13. The foreclosure crisis is far from over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011 or beyond. *See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

14. Since the commencement of the crisis, revelations of bogus, false, and deceptive "robo signing" have come to light involving national lenders and mortgage servicers.  In Maryland the illegal "robo-signing" issue has even come to the forefront because attorneys and substitute trustees, including those acting on behalf of CitiMortgage have admitted that they filed bogus documents in hundreds of foreclosure cases filed in state courts.

**B.    MARYLAND'S RESPONSE TO THE FORECLOSURE CRISIS**

15. In 2007 at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was then underway.   The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a community from one dominated by homeowners to one dominated by investors.

Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.

Maryland Homeownership Preservation Task Force Report at 12 (November 29, 2007)

*available at* http://www.gov.state.md.us/documents/HomePreservationReport.pdf

(footnotes omitted).

18. To reasonably address and avoid some of the negative consequences of foreclosure, the Task Force Report made nine general recommendations that are relevant to the issues before the Court. *See Id.* at 40-43. Included among these was a specific recommendation, which included the adoption of a good faith and fair dealing standard of care for loss mitigation in Maryland. *Id.* (recommendation 7.3).

19. In response to the expanding foreclosure crisis and the Task Force Report, the General Assembly introduced and passed several bills during the 2008 legislative session to change Maryland's foreclosure process and curb certain predatory real estate processes. These bills were passed with nearly complete bi-partisan support. As summarized in the General Assembly's 90 Day Report for the 2008 session:

Until [2008], Maryland's foreclosure process, from the first foreclosure filing to final sale, had been among the shortest in the nation. Maryland is a quasi-judicial State, meaning that the authority for a foreclosure sale is derived from the mortgage or deed of trust, but a court has oversight over the foreclosure sale process. Most mortgages or deeds of trust include a "power of sale" (a provision authorizing a foreclosure sale of the property after a default) or an "assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

***Senate Bill 216*** *(Ch. 1)*/***House Bill 365*** *(Ch. 2)*, emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

. . . .

***Senate Bill 217***/***House Bill 360*** define "mortgage fraud" as any action by a person made with the intent to defraud that involves:
• knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;
• receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;

• conspiring to violate either of the preceding provisions; or
• filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as well as the notarizing of any document in connection with a mortgage loan.

Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008 Legislative Session, F16-18 (April 11, 2008) *available at* http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

20.  The Maryland Court of Appeals recently adopted in October 2010 an emergency rule to deal with the robo-signing issue based upon the recommendation of the Standing Committee on Rules of Practice and Procedure.  Writing for the Committee the Honorable Alan M. Wilner explained:

The need for these changes emanates from recent revelations regarding the filing in residential foreclosure actions of affidavits as to which the affiant either did not have sufficient knowledge of the facts stated in the affidavit to validly attest to their accuracy or did not actually read or personally sign the affidavit. Preliminary audits have shown that hundreds of such affidavits have been filed in Maryland circuit courts. Up to this point, courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged. Evidence that has recently come to light, largely through admissions under oath by the affiants themselves, has shaken the confidence that the courts have traditionally given to those kinds of affidavits.

In the Committee's view, the use of bogus affidavits to support actions to foreclose liens on property, apart from prejudice to the homeowners, constitutes an assault on the integrity of the judicial process itself.

Letter from A. Wilner to the Court of Appeals, Oct. 15, 2010.

21. In further response to the foreclosure crisis, Maryland Commissioner of Financial

Regulation has established  "a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the…servicing…of any mortgage loan, including, but not limited to…(3) The duty when servicing mortgage loans to: (a) Promptly provide borrowers with an accurate accounting of the debt owed when borrowers request an accounting; (b) Make borrowers in default aware of loss mitigation options and services offered by the licensee; (c) Provide trained personnel and telephone facilities sufficient to promptly answer and respond to borrower inquiries regarding their mortgage loans; and (d) Pursue loss mitigation when possible." Md. Code Regs. 09.03.06.20.

**C.** **Background on Mr. Sequeira's Mortgage Loan Subject to this Action**

22.  Mr. Sequeira is the owner of the Property.   He purchased the Property on or about February 17, 2007.

23. Mr. Sequeira became concerned about his mortgage in April 2009 as a result of a job loss and reduction of income.

24. In an effort to be a proactive and responsible homeowner, Mr. Sequeira contacted CitiMortgage to seek a modification at the end of 2009.   Mr. Sequeira completed the modification application in January 2010 by telephone and submitted the application in February 2010 seeking to change and modify the terms of his current mortgage loan, without requesting additional advances or credit, by adjusting his monthly mortgage payment to 31% of his then total pretax monthly income.   Included with the request Mr. Sequeira provided CitiMortgage will all the required documentation and support documents requested as part of the credit application (referred to as "First Modification Request").

25. In February of 2010 Mr. Sequeira was approved for a trial period loan modification offered by CitiMortgage, which he accepted and completely performed and relied upon.

26. Mr. Sequeira timely made each of CitiMortgage's required trial period modification payments of about $821 beginning February 2010.

27. On approximately a monthly basis Mr. Sequeira called CitiMortgage to check on the status of his credit application seeking a permanent modification request and to see if there was anything else needed by it to complete his credit application for a permanent modification.

28. On or about August 2010 Mr. Sequeira was told by a CitiMortgage representative over the telephone that his credit application for a loan modification had been denied due to a lack of income - even though each of the trial period payments were made on time and he had never missed a payment due under his mortgage.  In addition, CitiMortgage never sent Mr. Sequeira any written statement of credit denial detailing any reason for denying his application for credit which would have permitted him to correct any error by CitiMortgage.

29. Commencing October 2010, Sequeira began making his regular, monthly payments again in the sum of approximately $1500 a month to CitiMortgage; however he was not able until July 2011to pay CitiMortgage the difference between his three trial and regular payments.  As a result CitiMortgage charged Mr. Sequeira penalties and interest each month (in the total sum of about $895.16 in late charges and $5,995.84 in interest) until he was able to borrow the funds necessary to pay the difference between the trial and regular payments incurred at the instruction of CitiMortgage.

30. In October/November 2010 Mr. Sequeira applied for a "traditional" loan modification through CitiMortgage.  In this request he again sought to change and modify the terms of his current mortgage loan, without requesting additional advances, by adjusting his monthly mortgage payment to 31% of his total pretax monthly income or some other similar terms designed to defer the sum due on his mortgage until a time when he could improve his income.  Mr. Sequeira provided CitiMortgage another complete application and also provided paystubs, other requested documentation, and a hardship letter (hereinafter referred to as "Second Modification Request").  No acknowledgement or denial was ever received by Mr. Sequeira regarding this application.

31. After submitting the completed Second Modification Request and providing CitiMortgage with all requested documents, Mr. Sequeira began calling CitiMortgage about 3 to 4 times per month, and sometimes more, to ensure they had all documentation needed to process the request and to confirm he was under consideration as had been represented to him by CitiMortgage representatives on each call.

32. In December 2010 Mr. Sequeira was told by a CitiMortgage representative that he was denied the Second Modification Request because CitiMortgage stated his monthly debt payments exceeded his income—a false statement to which Mr. Sequeira had never been given any written notice from CitiMortgage.

33. Mr. Sequeira sent CitiMortgage a dispute letter concerning the denial of his Second Modification Request but it was never acknowledged by CitiMortgage.

34. Mr. Sequeira later learned that CitiMortgage's denial of the Second Modification Request was bogus since CitiMortgage was including debt that Mr. Sequeira was not in fact liable for in its calculations and determination to deny the  Second Modification Request.  Had

CitiMortgage ever provided Mr. Sequeira with a written statement of credit denial he would have been able to promptly correct CitiMortgage's error.  Even when he finally did reach the CitiMortgage underwriter. Ms. Lindsey Beamer, handling the Second Modification Request by email and sent her copies of his credit report and circled where it stated he was only an authorized signer, not the debtor, CitiMortgage refused to reconsider its error.

35. At the direction of another CitiMortgage representative, Tony, Mr. Sequeira again applied in January 2011 for and sought to change and modify his the terms of his current mortgage loan, without requesting additional advances or credit, by adjusting his monthly mortgage payment to 31% of his total pretax monthly income or some other similar terms designed to defer the sum due on his mortgage until a time when he could improve his income.  Mr. Sequeira provided CitiMortgage another complete application and also provided paystubs, other requested documentation, and a hardship letter (hereinafter referred to as "Third Modification Request").  No acknowledgement or denial was ever received by Mr. Sequeira regarding this application.

36. Again Mr. Sequeira continued to contact CitiMortgage on a regular basis, almost weekly, to make sure all documentation they needed was in and sufficient.

37. In February 2011 CitiMortgage told Mr. Sequeira orally that it would not consider his self-employment income until he filed his 2010 taxes and showed the income on his taxes.  Mr. Sequeira promptly filed his 2010 taxes, including his self-employment income, and provided complete copies to CitiMortgage.

38. Even after completing his tax return and providing sufficient bona fide documentation to support his self employed income, CitiMortgage denied the Third Modification Request

by telephone without ever providing Mr. Sequeira with a written statement of denial. The only explanation he could receive from CitiMortgage orally was a bogus response that it could not include certain of the self-employment income into Mr. Sequeira's overall income because he did not have expenses associated with that income.

39. After the denial of the Third Modification Request, Mr. Sequeira sent a dispute letter and followed up with CitiMortgage with phone calls and attempted to explain to whomever he spoke with and to Tony that he had no expenses with that income because he worked as a personal trainer and did manual labor for that income and in fact had no expenses to include.

40. In May of 2011 Mr. Sequeira contacted a certified housing counselor, Mr. Matthew Gregory with CCCS, to try and assist him with a loan modification request. The counselor, on behalf of Mr. Sequeira sent another completed loan modification request. Specifically, Mr. Sequeira applied for and sought to change and modify the terms of his current mortgage loan, without requesting additional advances or credit, by adjusting his monthly mortgage payment to 31% of his total pretax monthly income or some other similar terms designed to defer the sum due on his mortgage until a time when he could improve his income. On Mr. Sequeira's behalf the counselor provided CitiMortgage another complete application and also provided paystubs, other requested documentation, and a hardship letter (hereinafter referred to as "Fourth Modification Request"). No acknowledgement or denial was ever received by Mr. Sequeira regarding this application.

41. In June of 2011 the loan modification request through the housing counselor was denied; however, CitiMortgage never sent Mr. Sequeira a written denial or any written statement of denial for the Fourth Modification Request. .

42. With respect to each denial and dispute letter Mr. Sequeira never received a written response from CitiMortgage explaining the reasons for denial or status of the dispute letter. He never was provided any explanation of the credit reports that were reviewed by CitiMortgage in connection with his requests.

43. Since the denial of the Fourth Modification Request Mr. Sequeira has received a number of notices of intent to foreclose from CitiMortgage threatening to foreclosure on him and his home and property.

44. Without the loan modification Mr. Sequeira has struggled to keep up with all of his monthly expenses and has considered filing bankruptcy to clear his unsecured debt so that he can focus on keeping his mortgage current and keeping his home.

45. Mr. Sequeira has been damaged by CitiMortgage's direct and indirect actions, including those by its authorized attorneys, employees, agents, and sub-agents, described herein through the improper threat of an imminent foreclosure action against the Property and Mr. Sequeira which has damaged his credit, the assessment of unfair and deceptive late fees and costs to his account, cost him legal fees and expenses and lost time from work while attempting to resolve this dispute without the need for litigation, and caused emotional damages due to stress and other physical manifestations including loss of sleep, panic attacks, jaw pain from grinding his teeth, etc..  The Plaintiffs' Class has suffered similar damages.

**Plaintiffs' Class Definition**

46. This class action is brought by Mr. Sequeira on behalf of himself and a Plaintiffs' Class of all Maryland homeowners whose mortgage loans (i) have been serviced by CitiMortgage and (ii) since three years proceeding this action have sought to change the

terms of their existing mortgage without requesting additional advances or credit; and (iii) have not received any written notice of denial of their request for modification or change in terms and (iv) have been subject to a foreclosure action or threat of foreclosure by CitiMortgage directly or indirectly through its authorized attorneys and agents (hereinafter "Plaintiffs' Class").

### Facts Common to the Plaintiffs' Class

47. Named Plaintiff sues on his own behalf and on behalf of a Plaintiffs' Class of persons under Fed. Rule. Civ. Pro. 23.

48. Plaintiff does not know the exact size or identities of the proposed Plaintiffs' Class, since most of the information is in the exclusive control of Defendants.  Certain information may be reported by the Defendant to the State of Maryland and may also be part of the public records.  Plaintiff believes that the Plaintiffs' Class encompasses many hundreds of individuals and whose identities can be readily ascertained from CitiMortgage's books and records as well as public records.  Therefore, the proposed Plaintiffs' Class is so numerous that joinder of all members is impracticable.

49. Plaintiff believes the amount in controversy is more than $5 million.

50. All members of the Plaintiff's Class have been subject to and affected by the same conduct. The claims are based on standard form contracts and uniform loan modification processing requirements and procedures employed by CitiMortgage.  There are also questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

  a.      the nature, scope and operation of  CitiMortgage's

obligations to homeowners under its mortgage modification programs;

b.        whether CttiMortgage's threat, referral to or prosecution of a foreclosure or foreclosure sale/action while simultaneously considering a borrower for a modification amounts to a breach of contract and/or a breach of its duty of good faith and fair dealing to the Plaintiffs Class and constitutes an unfair and deceptive practice or misrepresentation or omission under Maryland law;

c.        whether CitiMortgage's failure to provide a written denial to the Plaintiffs Class requests for a change in the terms of their existing credit without request for additional advances is a violation of CitiMortgage's duty of good faith and fair dealing to the Plaintiffs Class;

d.        whether CitiMortgage's conduct violates the Equal Credit Opportunity Act ("ECOA"),  15 U.S.C. § 1691 e*t seq*. and state law requirements relating to Equal Credit;

e.        whether CitiMortgage's conduct violates the Maryland Consumer Protection Act ("MCPA"), MD CODE ANN., COM. LAW, § 13-101, *et seq.;*

f.        whether CitiMortgage's conduct violated the MARYLAND CONSUMER DEBT COLLECTION ACT ("MDCDCA"), MD CODE ANN., COM. LAW, § 14-201, et seq*.;*

g.        whether CitiMortgage's conduct violated the MARYLAND MORTGAGE FRAUD PREVENTION ACT ("MMFPA"), MD CODE ANN., REAL PROP., § 7-401, *et seq.;*

h.        whether there are more than 50 borrowers who are members of the

Plaintiffs' Class;

i.        whether CitiMortgage should be enjoined from continuing to pursue foreclosure actions, directly or indirectly, in Maryland concerning borrowers who have requested a mortgage modification of their existing credit arrangement without seeking additional credit but whom they have not received a written denial from CitiMortgage;

j.        the attorney fees, litigation costs, and court costs allowed and claimed in this civil action;

k.        the declaratory relief sought in this civil action; and

l.        The injunctive relief sought in this civil action.

51. The claims of the Named Plaintiff are typical of the claims of the class and do not conflict with the interests of any other members of the Plaintiffs Class that both the Named Plaintiff and the other members of the Plaintiffs Class were subject to the same conduct, same modification procedures by CitiMortgage, and were met with the same absence of any written response to apllications for a change in mortgage terms without an extension of additional advances and/or subject to or threatened with foreclosure before a modification had been denied or even completed in writing.

52. Named Plaintiff is similarly situated with and has suffered similar damages as the other members of the Plaintiffs Class as described in ¶ 45 above.

53. The Named Plaintiff will fairly and adequately represent the interests of the Plaintiffs Class. He is committed to the vigorous prosecution of the class claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions. Named Plaintiff has no interests adverse to the

Class.

54. A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

55. This putative class action meets all of the requirements of Fed. Rule. Civ. Pro. 23.

56. CitiMortgage has acted or refused to act on grounds that apply generally to the Plaintiffs' Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

57. It would not be economically feasible for each of the individual Plaintiffs Class members to maintain similar claims since many of them have already suffered financial setbacks.

58. The damages of each individual Plaintiffs Class members can be calculated using the same common formulas.

59. Failure to join the claims of each individual claimant into class claims would lead to duplicate claims/litigation involving the same issues and facts, excessive costs and fees, burdens and potentially inconsistent outcomes.

60. The common issues set forth above predominate and asserting the claims on a class basis is superior to the alternative of individual actions.

61. The Plaintiffs Class had no reason to know of the true illegal nature of the illegal acts of the Defendants and Defendant Class concerning the responses to their mortgage loan modification requests since the Defendant routinely omit or misrepresent certain required information from the Plaintiffs Class concerning the status of the hundreds of modification requests made to them during the class period.

62. This case is one of those rare instances where circumstances external to the conduct of the Plaintiffs Class which warrant a finding that it would be unconscionable to enforce the various federal and state limitations periods against the Plaintiffs Class since such an act would create a gross injustice of allowing the Defendant to wrongfully and unjustly enriched to the detriment of the Plaintiffs Class in the millions of dollars.

63. This matter is an extraordinary circumstance at the core of the current economic troubles related to the slumping housing environment that is beyond the control of the Plaintiffs Class and Named Plaintiff who trusted that licensed mortgage professionals, including the Defendant, would comply with the law.  Because the Defendant misrepresented that their acts were authorized by the government, the Plaintiffs Class had no reason to investigate further on their own.

<u>**COUNT I -- VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT (15 U.S.C. §1691(d))**</u>
(Individual and Plaintiffs' Class Claim)

64. Mr. Sequeira reiterates and incorporates every allegation above, including those specifically alleged in ¶¶ 22-29, as if set forth herein in full and adds:

65. Mr. Sequeira is an "applicant" as governed by ECOA, 15 U.S.C §1691a(b).

66. CitiMortgage is a "creditor" as governed and defined by ECOA, 15 U.S.C. §1691(a)(e) at all times relevant hereto.

67. 15 U.S.C §1691(d)(1) provides that "within thirty days…after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application."

68. The accompanying Regulation B, issued by the Board of Governors of the Federal Reserve System pursuant to ECOA, further provides: "A creditor shall notify an applicant of action taken within: (i) 30 days after receiving a completed application concerning the

creditor's approval of, counteroffer to, or adverse action on the application." 12 C.F.R §202.9(a)(1)(i).

69. Additionally, 15 U.S.C. §1691(d)(2) requires "that each applicant against whom "adverse action" is taken shall be entitled to a statement of reason for such action from the creditor." 15 U.S.C. §1691(d)(2).

70. 15 U.S.C. §1691(d)(6) defines "adverse action" as a denial or revocation of "credit", a change in terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or substantially the terms requested." 15 U.S.C. §1691(d)(6)

71. The term "credit" means the right granted by a debtor to defer payment of a debt or to incur debts and defer its payment…and defer payment thereof. 15 U.S.C. § 1691a (d); 12 C.F.R. §202.2(j).

72. The applications for modifications of their loan terms by the Named Plaintiff and Plaintiffs Class Members were applications for "credit" as defined by 15 U.S.C. § 1691a(d) and 12 C.F.R. §202.2(j).

73. Named Plaintiff and Plaintiffs Class Members provided CitiMortgage with completed applications for credit.

74. CitiMortgage failed to evaluate the Named Plaintiff and the Plaintiffs Class Members' loan modification requests in good faith and a make any determination on the applications application after receiving the completed loan modification applications.

75. Instead, CitiMortgage grossly ignored its responsibility to respond to Mr. Sequeira and the Plaintiffs Class' loss mitigation requests as proscribed in Md. Code Regs. 09.03.06.20 and proceeded to threaten or engage in illegal foreclosure actions.

76. In failing to evaluate the Plaintiffs' Class applications for credit in a manner required by the Md. Code Regs. 09.03.06.20, CitiMortgage effectively denied the Plaintiffs' Class credit, and thereby took "adverse action" – as defined by ECOA – on the Plaintiffs' Class' applications.

77. The Plaintiffs Class never received written notice from CitiMortgage or anyone else of the adverse action taken on their applications for loan modifications.

78. Additionally, CitiMortgage's belated notifications by telephone described above were not in compliance with the notification requirements set forth in ECOA, 15 U.S.C. §1691(d)(2), as the notification failed to provide Plaintiff with a specific, truthful statement of written reasons for the adverse action taken.

79. The above failure of CitiMortgage to notify the Plaintiffs Class of the adverse actions taken on their application within thirty days from receipt of their completed application for credit as mandated by 15 U.S.C §1691(d)(1), §1691(d)(2) and 12 C.F.R §202.9(a)(1)(i) was a substantive violation of ECOA.

80. As a result of the above ECOA violations, the Plaintiffs Class has suffered substantial actual damages in the following:

   a. the loss of the Plaintiffs Class' rights to explain or quickly rectify and address any errors or problems in their applications for credit;

   b. the assessment of extra fees and charges by CitiMortgage that accrued due to its delays in responding the Plaintiffs Class' requests for credit;

   c. the loss of the credit itself; and

   d. frustration, anger, humiliation, fear, embarrassment and other emotional and mental anguish.

81. As a result of the above alleged ECOA violations, CitiMortgage is liable to Plaintiffs
    Class and Named Plaintiff for actual damages pursuant to 15 U.S.C. §1691(e)(a), for
    punitive damages against CitiMortgage pursuant to 15 U.S.C. §1691e(b) and for
    attorneys fees and costs pursuant to 15 U.S.C. §1691(e)(d) and 12 C.F.R. §202.16(b).
    WHEREFORE, Named Plaintiff prays this Court to award the following relief against
    CitiMortgage for its violation of ECOA:

    A. The Court certify the Class and appoint the Named Plaintiff as class
       representative and his counsel as Class Counsel;

    B. Actual damages as described in ¶ 45 above in a sum of no less than $20,000
       per Plaintiffs' Class Member pursuant to 15 U.S.C. §1691 (e)(a).

    C. Punitive Damages in the amount of $500,000 against CitiMortgage pursuant
       to 15 U.S.C. §1691e(b).

    D. Attorneys fees and costs pursuant to 15 U.S.C. § 1691e (d).

    E. The Plaintiffs' Class and Named Plaintiffs are also entitled to equitable relief
       pursuant to 15 U.S.C. § 1691e (c) and Fed.R.Civ.P. 23 against CitiMortgage
       and asks this Court to: (i) enter an Order declaring that CitiMortgage's
       conduct is a violation of ECOA, insofar as it failed to provide notice to
       Named Plaintiff and Plaintiffs' Class of its actions on their applications for a
       modification or change in credit within thirty day from receipt of the Plaintiff
       Class' applications for credit to modify their mortgage loans; and (ii) require
       delivery of ECOA Complaint notices in all future instances.

## COUNT II -- VIOLATION OF THE MARYLAND
## CONSUMER DEBT COLLECTION ACT
## MD CODE, COMM. LAW, § 14-201 *et seq.*
(Individual and Plaintiffs' Class Claim)

75.     Mr. Sequeira realleges and incorporates by reference the foregoing allegations.

76.     By threatening an intent to foreclose, CitiMortgage has acted as a collector,

directly and indirectly, as that term is defined by § 14-201(b) of MD. CODE, COMM.

LAW.

77.     Mr. Sequeira and the Plaintiffs' Class are persons as defined by § 14-201(d) of

MD. CODE, COMM. LAW.

78.     The underlying mortgage transaction and threat of foreclosure related to this

complaint constitutes a "consumer transaction" as defined by § 14-201(c) of MD.

CODE, COMM. LAW.

79.     CitiMortgage has claimed, attempted, or threatened to enforce a right with

knowledge that their right did not exist under Maryland or Federal law until they

complied with ECOA, the Maryland Equal Credit Protection Act, and Md. Code

Regs. 09.03.06.20.

80.     Mr. Sequeira and the Plaintiffs' Class' damages as alleged herein were

proximately caused by CitiMortgage's actions including damages for emotional

distress or mental anguish suffered with or without accompanying physical injury as

well as those damages described in ¶ 45  above.

WHEREFORE, Mr. Mr. Sequeira prays for the following relief against CitiMortgage for

their violations of the Maryland Consumer Debt Collection Act:

A.  The Court certify the Class and appoint the Named Plaintiff as class

representative and his counsel as Class Counsel;

B.  A money judgment of all damages caused by CitiMortgage's actions, directly or indirectly, of $25,000 per Plaintiffs Class member;

C.  Their costs including attorneys' fees as well as pre- and post-judgment interest;

D.  Such other and further relief as the nature of their cause may require.

## COUNT III – VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*

(Individual and Plaintiffs' Class Claim)

81.  Mr. Sequeira realleges and incorporates by reference the foregoing allegations.

82. The mortgage loan transactions and foreclosure practices as set forth herein of the CitiMortgage against the Named Plaintiffs and Plaintiffs' Class members are governed by the Consumer Protection Act, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*

83. Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts.  The prosecution of a foreclosure action involves both the extension of credit and the collection of debts.

84. The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive.

85. By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above, and by failing to disclose material facts where the

failure to do so deceived or tended to deceive, the Defendant has committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act. Sec. 13-301(1) and (3) and Sec. 13-303(4) ("MCPA").

86. The Defendant's conduct, as set forth above, had the capacity, tendency or effect of deceiving Mr. Sequeira and other Plaintiffs' Class members, who in fact were deceived or misled, causing injury and loss through:

    a.  the unfair or deceptive prosecution based upon incomplete and bogus responses to the Plaintiffs Class members' requests for modifications of their loan terms, or threat of prosecution of a foreclosure action by Defendant through their authorized agents.

    b.  the unfair or deceptive practices of charging the Plaintiffs Class Members late fees and other charges which resulted when they offered and accepted Trial Payment Plans ('TPP") and actually made each of those TPP plan payments on-time.

94. Mr. Sequeira and the Plaintiffs' Class' damages as alleged herein were proximately caused by CitiMortgage's actions including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described in ¶ 45 above.

WHEREFORE, Mr. Sequeira prays for the following relief against Defendant for its violations of the Maryland Consumer Protection Act:

A. They be awarded as part of this claim a sum of no less than $20,000 per Plaintiffs Class Member which represents their compensatory damages as a result of the Defendant's direct and indirect, unfair or deceptive practices as described herein

including the Defendant's failure to comply with ECOA, the Maryland Equal Credit

Protection Act, and Md. Code Regs. 09.03.06.20;

B.  The Court certify the Class and appoint the Named Plaintiff as class representatives

and his counsel as Class Counsel;

C.  They be awarded their reasonable attorney's fees and costs; and

D.  That their claim should include such other and further relief as the Court deems just

and proper.

## COUNT IV – MARYLAND MORTGAGE FRAUD PROTECTION ACT, MD. ANN. CODE, REAL PROP. § 7-401 MD. REAL PROP., *et seq.*

(Individual and Plaintiffs' Class Claim)

95.  Mr. Sequeira realleges and incorporates by reference the foregoing allegations.

96.  The Maryland Mortgage Fraud Protection Act, Md. Ann. Code, Real Prop. § 7-401

MD. REAL PROP., *et seq.* ("MMFPA") governs the relationship between the Defendant

with the Named Plaintiff and Plaintiffs' Class.

97.  MD ANN. CODE., REAL PROP. § 7-401 (c) provides: "Homeowner" means a record

owner of residential real property. The Plaintiffs and Plaintiffs' Class Members are

record owners of the residential properties in question and therefore are Homeowners.

98.  MD ANN. CODE., REAL PROP. § 7-401 (e) provides "Mortgage lending

process…includes [t]he…servicing…of a mortgage loan."

99.  MD ANN. CODE., FINANCIAL INSTITUTIONS CODE. § 11-501 (k)(1) provides: "Mortgage

loan" means any loan or other extension of credit that is: (i) Secured, in whole or in

part, by any interest in residential real property in Maryland; and (ii) If for personal,

household or family purposes, in any amount."

100.    The MMFPA works to protect the interests of all parties to mortgage issues in

Maryland from misstatements, misrepresentations and omissions; in this instance the

MMFPA works to protect borrowers like Mr. Sequeira from mortgage companies like

the Defendant and ensure a level, fair playing field between all borrowers and

professionals.

101.    The Named Plaintiff and Plaintiffs' Class members were or are homeowners in

the Mortgage Lending Process as defined by the MMFPA since the actions in dispute

in this lawsuit involve the servicing of their residential mortgage loans as it relates to

a foreclosure action or threat of foreclosure which is an attempt to collect a certain

sum on the mortgage transaction.

102.    MD ANN. CODE., REAL PROP. § 7-401 (d) provides:

"Mortgage fraud" means any action by a person made with the intent to defraud

that involves:

1.    Knowingly making any deliberate misstatement, misrepresentation
or omission during the mortgage lending process with the intent
that the misstatement, misrepresentation or omission be relied on
by a mortgage lender, borrower or any other party to the mortgage
lending process;

2.    Knowingly using or facilitating the use of any deliberate
misstatement, misrepresentation, or omission during the mortgage
lending process with the intent that the misstatement,
misrepresentation, or omission be relied on by a mortgage lender,
borrower, or any other party to the mortgage lending process.

3.    Receiving any proceeds or any other funds in connection with a
mortgage closing that the person knows resulted from a violation
of item (1) or (2) of this section;

4.    Conspiring to violate any provisions of item of (1), (2) or (3) of
this section…

103.    The Defendants and Defendant Class have committed Mortgage Fraud by:

a.          Knowingly making, as described herein, deliberate misstatements, misrepresentations and omissions during the mortgage lending process, including failing to respond to the Named Plaintiff and Plaintiffs Class' requests for a modification or change of their mortgage loans, with the intent that the misstatements, misrepresentations and omission be relied on by the Named Plaintiff and Plaintiffs Class members (and the general public);

b.          Knowingly using or facilitating, as described herein, the use of any deliberate misstatements, misrepresentations, and omissions during the mortgage lending process, including the state court foreclosure actions it has commenced and carried out, with the intent that the misstatements, misrepresentations, and omissions be relied on by the Named Plaintiffs and Plaintiffs Class members.

104.      Plaintiff and the Plaintiffs Class Members have been damaged by the Defendant's deliberate misstatements, misrepresentations, and omissions during the mortgage lending process as stated herein including ¶¶ 45 above.

105.      MD ANN. CODE., REAL PROP. CODE. § 7-401 (g) provides:

Pattern of mortgage fraud means two or more incidents of mortgage fraud that:

- Involve two or more residential real properties; and
- Have similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics.

106.      Upon information and belief the Defendant has engaged in a Pattern of Mortgage Fraud by committing similar acts against two or more Maryland residential properties with similar intents, results and methods of commission as that which was committed by Defendant against the Plaintiffs Class as described herein.

WHEREFORE, Mr. Sequeira requests the following on his behalf and the Plaintiffs' Class:

A.   They be awarded as part of their claims the sum of no less than $20,000 per class member which represents  their compensatory damages as a result of the Defendant's illegal practices and misrepresentations;

B.   The Court certify the Class and appoint the Plaintiff as class representative and his counsel as Class Counsel;

C.   The Class be awarded as part of all their claims the sum of no less than $60,000 per class member for the Defendant's willful and knowing violations;

D.   They be awarded as part of the claim their reasonable attorney's fees and costs; and

E.   That their claim should include such other and further relief as the Court deems just and proper.

Respectfully Submitted,

/s/ Scott C. Borison
Scott C. Borison, Esq. (Bar No. 22576)
borison@legglaw.com

/s/ Phillip Robinson
Phillip R. Robinson, Esq., Of Counsel
(Bar No. 93431)
probinson@legglaw.com

/s/ Janet Legg
Janet Legg, Esq. (Bar No. 15552)
legg@legglaw.com
Legg Law Firm, LLC.
5500 Buckeystown Pike
Frederick, Maryland 21703
(301) 620-1016
Fax: (301) 620-1018